24 C.C.P.A.(Patents)

In re BENDER.

Patent Appeal No. 3717.

Court of Customs and Patent Appeals.

Dec. 7, 1936.

Jos. N. Nielsen, of New York City (Charles H. Potter and Harold T. Stowell, both of Washington, D. C., of counsel), for appellant.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for the Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GRAHAM, Presiding Judge.

The appellant filed his application in the United States Patent Office on April 16, 1931, for a patent on certain claimed new and useful improvements in resin dehydration. All the claims in the case, 30 to 37, inclusive, were rejected by both tribunals in the Patent Office. In this court appellant moves to dismiss his appeal as to claim 37. The examiner rejected the claims on the following references:

Novotny, 1,771,140, July 22, 1930.

Pollak et al., 1,935,411, November 14, 1933.

Claims 32 and 34 are typical, and are as follows:

"32. Process of preparing a resin of the heat-hardening type which comprises reacting the ingredients forming the resin in the presence of water, partially removing water from the reaction mixture, projecting the mixture in the form of finely divided particles into a current of relatively dry gas heated to a temperature causing volatilization of the liquid and sufficiently high to cause fusing and heat-hardening of the resin, and limiting the time of contact of the heated gas with the mixture so as to secure substantial removal of the liquid but without transforming the resin to its heat-hardened state."

"34. Process for removing volatile liquid from a fluid mixture including with the volatile liquid a synthetic resin hardening to a solid infusible state upon heating which comprises projecting the mixture in the form of finely divided particles into a current of relatively dry gas heated to a temperature causing volatilization of the liquid and sufficiently high to cause fusing and heat-hardening of the resin, and directing the particles after contact with the heated gas into a relatively cool zone to arrest any heat-hardening action of the resin and promote solidification by cooling, limiting the time of contact of the heated gas with the mix-

ture so as to secure substantial removal of the liquid but without transforming the resin to its heat-hardened state."

The claims were rejected on both references, and this view was concurred in by the Board of Appeals.

The appellant's process is one for dehydrating synthetic resins, more particularly resinoids. In practicing his process, the applicant has in mind the removal of water and other impurities from resinoids to the point where the resulting product can be easily molded and worked. The purpose is to approach, but not to reach, an infusible state by the application of heat, thus removing the impurities without reaching the stage where the material cannot, by reason of hardening, be easily manipulated. In practicing the process, customarily water is first removed by the reaction process in a digestor. Thereafter the fluid resinous substance is sprayed in a finely divided spray into a heated gas stream, where it is subjected, for a brief period, to the action of such stream of heated gas, which is of a temperature sufficient to cause volatilization of the sprayed liquid and sufficiently high to cause fusing and heat-hardening of the same. The time within which the sprayed resin is thus subjected to the heated current of air or gas is limited, so that the hardening into an infusible state will not occur. After passing through this stream of heated gas for a limited period, the particles which have been formed during the spraying process fall through a chamber, and while so falling are subjected to the action of a cooling zone wherein these particles are subjected to the action of a current of relatively cool gas to further arrest any heat-hardening process. The result is a powdered product which is at once available for molding and manufacture.

The reference patents will be briefly described:

Novotny discloses a process for the accomplishment of the same purpose, namely, to produce a product which has not been polymerized, and which is adapted to easy manipulation. Novotny discloses that he sprays the resinous mass into very fine particles of almost molecular size, and this spray is maintained in a fine state of division "either in a current of relatively cool air or in a spray or bath of water." It is quite evident, from a perusal of Novotny's patent, that his underlying idea is to cool the incoming current of sprayed resinoid as soon as it leaves the spray. He states in his spec-

ification: "As the molecular division of the spray nozzle treated resinous product is more or less affected by heat and tends to pack and fuse together, the sudden chilling and elimination of impurities in the water bath prevents further fusion. * * *".

It further appears, from the patent, that the spray is operated and the resinous mass projected by the impact of nozzle air heated to about 240° F. The patent recites that the resinous stream is preferably directed into a spray or body of water "to rapidly cool the resin." However, the patent also recites: "Where air drying is used the air current should have a temperature of from 100 to 110° F. and a sufficient velocity to float the subdivided particles to a suitable air separator." After the resinous spray passes through the water or cooling air, no further steps are added to the process, but the resulting product is supposed to be ready for manipulation.

As it seems to the court, the examiner misconstrued the disclosure of Novotny: The examiner states: "Novotny discloses, as a process for removing water and other volatile constituents from heat-hardenable synthetic resin, spraying the resin into hot air having preferably a temperature of about 240° F. and then bringing it in contact with relatively cooler air of 100°–110° F. * * *"

The Novotny disclosure shows a spraying by means of the force of a current of air of 240° F., but the liquid is not sprayed into such a current. Herein, it seems to us, both the examiner and the Board of Appeals fell into error. It is true the material is subjected in the Novotny process to contact with such a heated current of air, but such contact is but momentary, and long enough only to project the spray.

The patent to Pollak et al. shows a process for the manufacture of compositions from the products produced by the condensation of urea, thiourea, and the like, with aldehydes or their polymers, and describes a process wherein "products of a low degree of polymerization are produced by allowing the condensation solution to gelatinize whilst being subjected to the finest possible mechanical subdivision, after which the powder is dried until the physically combined water has been expelled, polymerization being however retarded meanwhile." In so doing, the patentee sprays the condensation solution "against a current of warm air." After this, it is said, the powder resulting therefrom can be used at once. The object is to produce a product which is not polymerized and can be easily molded and manipulated without resulting bad effects.

The temperature of the warm air into which the spray is projected is not given, nor is there any further cooling process after such spraying through this current of warm air. This patent also discloses the possible use of fibrous material mixed with the condensation mass.

We are unable to agree that claims 30 to 36, inclusive, here involved, were properly rejected. As it seems to the court, the processes of the patents, while aimed at the same objective, operated quite differently. This applicant has perfected a process in and by which he sprayed his resinous product into a stream of air or gas which was high enough in temperature to volatilize the liquid and to cause fusing and heat-hardening, and relies for his failure to reach the complete polymerization point by limiting the time of exposure to such stream of heated gas or air. Both Novotny and Pollak et al. have in mind the immediate cooling of the resinous spray. While Pollak et al. do not do this as rapidly as Novotny, still he uses warm air, bringing the same in contact with the resinous mass which must be heated to a higher degree in order to make it sprayable.

In addition to this point, the applicant has added another novel step to his process, so far as this record shows, to which but little attention has been paid by the tribunals of the Patent Office, namely, that of bringing the resinous spray through a cooling zone after first subjecting it to the action of a current of hot air for a limited period. This latter element is shown plainly in rejected claims 34, 35, and 36, the language of claim 34 being typical, "and directing the particles after contact with the heated gas into a relatively cool zone to arrest any heat-hardening action of the resin and promote solidification by cooling."

We are of opinion that claims 30 to 36, inclusive, should have been allowed.

The appeal is dismissed as to claim 37, and the decision of the Board of Appeals as to claims 30 to 36, inclusive, is reversed.

Reversed.